[Civ. No. 16892. Second Dist., Div. Three. Nov. 18, 1949.]

GATE-WAY, INC. (a Corporation), Appellant, v. W. B. WILSON et al., Respondents.

William J. Currer, Jr., and Walter Ely for Appellant.

Huebner, Beehler, Worrel, Herzig & Caldwell, Vernon D. Beehler, Benjamin J. Goodman and Paul G. Henderson for Respondents.

WOOD, J.—Action to enjoin defendant Wilson from disclosing plaintiff's alleged trade secrets, relating to a process of coating and lacquering door knobs and locks; and to enjoin defendants Hillgren Manufacturing Company, and Mr. and Mrs. Carl Hillgren, Carl C. Hillgren and Theodore Hamm, copartners doing business under the name of Hillgren Manufacturing Company, from using information, relating to such trade secrets, gained from defendant Wilson. Plaintiff appeals from the judgment in favor of defendants, and asserts that the evidence was insufficient to support the findings.

Plaintiff is engaged in manufacturing door knobs and locks. Defendant Wilson is a consulting engineer. The other defendants are also engaged in manufacturing door knobs and locks. Those defendants will be referred to herein as Hillgren.

Plaintiff alleged in its amended complaint that about June, 1947, plaintiff and Wilson entered into an oral agreement wherein it was agreed that Wilson for a consideration of $600 would furnish his services as a consulting engineer in designing and building processes and combinations of machinery, which would be substantially an automatic production line, for the more efficient painting and lacquering of door knobs and locks; that Wilson would not reveal to any other manufacturer or to a competitor of plaintiff any process which might be designed by plaintiff with the assistance of Wilson, and he would not reveal any ideas or methods of building or combining machines into a production line which might be used by plaintiff in connection with the painting and lacquering of articles manufactured by plaintiff; that great precaution would be taken to protect the secrecy of such processes; and that the guarding of such secrecy was necessary in order

that plaintiff might reap the benefits of its efforts and expenditures in developing such processes. It was further alleged in the amended complaint as follows: Pursuant to said agreement, and by the mutual assistance of Wilson and officers and employees of plaintiff, machines were built which applied a certain process for painting and lacquering door knobs and locks, and said machines were so combined with other machines as to form a fully automatic production line for the painting and lacquering of door knobs, locks and other articles. Said machines and production line were and are unknown to other persons except those to whom defendant has disclosed the information in violation of his agreement and in violation of the confidence and trust plaintiff placed in him. Said process is a secret of plaintiff which is peculiar to its business. In order to build those machines and create such combination of machines plaintiff expended about $15,000. In the first part of August, 1947, the automatic production line was completed and Wilson was paid for his services. The machines and combination of machines formed the automatic production line, and said method of applying the process to plaintiff's business was very successful and resulted in a substantial competitive advantage to plaintiff. Thereafter Wilson, in violation of the confidence reposed in him by plaintiff and in violation of his oral agreement, offered to disclose to the other defendants the secret of said process and the automatic production line, and he offered to build for them machinery for a production line similar to that which had been built for plaintiff. The other defendants knew at the time of such offers that Wilson was violating the confidence reposed in him by plaintiff and that he was violating the agreement between plaintiff and Wilson. The other defendants accepted said offers, and Wilson is about to disclose to the other defendants said secret process and to build for them the same machinery and automatic production line which was built secretly for plaintiff. Unless Wilson is enjoined from disclosing such secret process to the other defendants the plaintiff will be damaged irreparably and the defendants will have succeeded in gaining knowledge of such secret process by unfair means.

The court found as follows (as stated in this paragraph): In June, 1947, plaintiff and Wilson entered into an oral agreement wherein it was agreed that Wilson for a consideration of $600 would furnish his services as a consulting engineer in the installation of the Ransburg coating process for the more efficient painting and lacquering of door knob

lock sets, and that they orally agreed that the installation of the Ransburg process would be substantially automatic and would reduce the handling of the lock sets by the employees. Plaintiff and Wilson did not enter into any oral or written agreement by which Wilson agreed not to reveal to any other manufacturer or to any competitor of plaintiff any process, method, machine or combination of machines installed in plaintiff's plant with or without the assistance of Wilson. Plaintiff with the advice and under the direction of Wilson and with the advice, assistance and direction of the DeVilbiss Company, Natural Gas Equipment Company, Harper J. Ransburg Company, and Bauer Winch and Hoist Company installed the Ransburg process in plaintiff's plant "along with a spray booth, bake oven, electrostatic field and conveyor system for the painting and lacquering of door knob lock sets." The Harper J. Ransburg Company, acting as an independent contractor, installed the Ransburg process in plaintiff's plant. The DeVilbiss Company, acting as an independent contractor, installed a spray booth therein. The Natural Gas Equipment Company, acting as an independent contractor, installed a bake oven therein. The Bauer Winch and Hoist Company manufactured and provided the chain for the conveyor system therein. Plaintiff expended about $11,000 for the installation of the Ransburg coating process with the spray booth, bake oven and conveyor system. Wilson as a consulting engineer applied certain skill, experience and technical knowledge in the installation of the Ransburg coating process used in connection with a spray booth, bake oven and automatic conveyor system. In August, 1947, "the Ransburg coating process, along with the spray booth, bake oven and conveyor system, were completed and put into operation" and Wilson was paid for his services. The allegations of the amended complaint relative to alleged offers by Wilson to disclose the secrets of said process, in violation of confidence and his agreement, are not true. The Ransburg coating process is a patented process under letters patent. The Harper J. Ransburg Company authorized plaintiff, under a written license, to use the Ransburg coating process. Hillgren is also a licensee of the Harper J. Ransburg Company. Wilson, in his relation with plaintiff, was an independent contractor. Door knobs were coated by others by an electrostatic coating process before the Ransburg coating process with the spray booth, bake oven, and conveyor system were installed in plaintiff's plant. There is no essential difference between the electrostatic coating of

door knobs and such coating of other metal objects of uniform shape. The Ransburg coating process has been in the public domain for some years prior to June, 1947, and had been successfully used in coating hardware of all kinds and in spraying articles of uniform shapes in mass production in automatic production lines including rotating vertical spindles. The construction and installation of the closed spray booth in connection with the Ransburg process, and the construction and installation of the bake oven in connection with said process, were not unique, original or novel but said closed spray booth and bake oven and similar closed spray booths and bake ovens had been in the public domain for many years and are disclosed in detail in trade publications, catalogues, and photographs which are available to anyone. All the individual parts installed in plaintiff's plant were combined to accomplish the process of coating door knob sets and the combination is the subject of common knowledge, is in the public domain, and is disclosed in detail in patents, trade publications, catalogues and photographs. The electrostatic coating process in Hillgren's plant is similar to the process in plaintiff's plant, but the similarity relates to matters in the public domain or to matters peculiar to the electrostatic coating process practiced under the Ransburg patents and under license from the Ransburg Company. Both plaintiff and the Hillgren Manufacturing Company use the process under license from the Ransburg Company. The coating process used by Hillgren Manufacturing Company is similar to the process used by other licensees of the Ransburg Company prior to June, 1947. The process used by Hillgren is in many respects dissimilar from the process used by plaintiff, and Hillgren did not use any of plaintiff's plans, drawings, or the specifications used by plaintiff in the installation of the process in its plant. Hillgren did not induce any breach of contract, confidence or trust between plaintiff and Wilson, and all information used by Hillgren in the installation of the process in its plant was obtained fairly from the public domain and was not obtained from plaintiff. Hillgren has not engaged in unfair competition with plaintiff. The electrostatic process in plaintiff's plant would be inoperative without the Ransburg electrostatic coating apparatus, and said apparatus is the basic element of the coating process. The court also found (as shown by the findings placed under the heading of conclusions of law) that plaintiff has not used any trade secrets in the installation of the Ransburg coating process, including the closed spray booth, bake

oven, conveyor system, and lacquer, and that no trade secrets have been used in the operation of the entire process; that plaintiff was not and is not possessed of any trade secrets in connection with said process; and that there was no confidential relationship between plaintiff and Wilson.

A general description of the Ransburg patented coating process is as follows: The process makes use of static electricity to charge the article to be coated and to charge the spray of coating material, with charges of opposite poles, thereby causing the spray material to be attracted to the article to be coated. In that process the article is the "ground" and the spray is charged in an electrostatic field, which field consists of a tubular framework strung with fine wires that are charged with high voltage.

Generally stated, the description of the production line apparatus, constructed in plaintiff's plant, is as follows: There is a conveyor, consisting of an endless chain, which carries the article that is to be coated. On the chain there are upright spindles, upon the tops of which the articles to be coated are placed, and the spindles rotate the articles while they are carried through the spraying and drying processes. The conveyor carries the articles to be coated from the loading zone through a spray booth, a vestibule, and an oven to an unloading zone or room where the coated articles are removed and placed in racks for assembly. The spray booth is enclosed, except at the ends thereof where the conveyor enters and leaves the booth, and except at a vent where excess vapors are taken off. Air is drawn into the booth through air filters, and it is withdrawn from the booth, in such a manner that the air movement in the booth is slow enough to prevent disruption of the mist-like spray which comes through the electrostatic field, and at the same time the air movement therein is fast enough to draw off the excess spray. Air in the spray booth is of room temperature. Adjoining the spray booth is a vestibule which extends to and adjoins the oven. The vestibule prevents the hot oven air from going into the spray booth, and it prevents the room temperature air of the spray booth from going into the oven. The oven dries the coating which has been placed upon the articles in the spray booth. Hot air is conducted into and through the oven.

Appellant asserts that the evidence was insufficient to support the finding that plaintiff and Wilson did not enter into any agreement wherein Wilson agreed not to reveal any

process installed in plaintiff's plant. There was a substantial conflict in the testimony as to whether there was such an agreement. Mr. Schoepe, president of the plaintiff company, testified that before he paid $300 in advance to Wilson he told Wilson that any work that was to be done on the installation must be kept in strict confidence, and that Wilson then said, "Yes." Mr. Herman Miller, a partner in the Miller Brothers Company, which is the distributing agent for the Ransburg process, testified that, after the installation was completed, he asked Mr. Schoepe and Wilson if they would let him take some pictures of the installation; that Mr. Schoepe said that he was undertaking to keep the development confidential, and Wilson said something "about refusing to permit any pictures to be taken because of some rubbish or something of that type." Wilson testified that he did not have any conversation with Mr. Schoepe concerning the secrecy of the machine; and that he did not have any conversation with him in which anything was said about not building a similar machine or production line for any competitor of plaintiff. The evidence was sufficient to support said finding.

Appellant also contends that the evidence was insufficient to support the findings that (1) the construction of the closed spray booth and the oven, in connection with the Ransburg process, is not unique, original or novel, but such construction has been in the public domain many years prior to June, 1947; and (2) plaintiff has not used, and was not possessed of, any trade secrets in connection with the installation of the Ransburg process. The Pugh patent issued in 1932, which is owned or controlled by the Harper J. Ransburg Company (defendant's Exhibit T), shows a closed spray booth with double doors at each end and a conveyor to carry objects through the booth. Defendant's Exhibit G, a circular on which there is a photograph of a Ransburg installation in the Frank I. King Company, shows an enclosed spray booth, and a conveyor with rotating vertical spindles on it. Mr. Miller, agent of the Ransburg Company, testified that the Ransburg process, shown in the photograph, was installed about May, 1946, and that it has been in operation since then, and that it could be used for coating door knobs. Mr. Miller also testified that a Ransburg process was installed at the Norge Refrigerator plant about February, 1946; that it has a closed spray booth with air filters in it, and it has a conveyor and an oven. Mr. Miller did testify, on cross-examination by plaintiff's counsel, that at the time of the installation at plain-

tiff's plant he did not know of any other electrostatic installation which was substantially the same as that at plaintiff's plant. On redirect examination he said that he meant (by the answer just referred to) that plaintiff's particular process is different in appearance, size and dimensions.

Wilson testified that in 1946 he designed an installation for the Fir-Tex Corporation for using the Ransburg process in coating artificial tile; that said installation included a closed spray booth, air filters, a vestibule, an oven, and a conveyor system. He also testified that before he entered into the transaction with plaintiff he took Mr. Schoepe to Miller Brothers' demonstration plant, and there, in the presence of Mr. Miller, they coated several door knobs. That demonstration plant had a spray booth, a conveyor, and lights for the baking process.

The Pugh patent, pertaining to the Ransburg process, states among other things that the invention relates to methods of coating and finishing metal parts, that a principal object of the invention is to provide an expeditious method for applying material uniformly to exposed surfaces, and that one embodiment of the invention contemplates the conveying of metal parts to be coated "through a closed chamber, the parts on the conveyor being connected in their passage there through to one terminal of a score of electrical energy of high potential."

It is not contended that the oven in plaintiff's plant is a trade secret, but Mr. Schoepe did testify that the venting of the oven was a part of his trade secret. He said that he developed the venting by trial and error, and that the trial and error method was definitely a part of his secret. It does not appear, however, what the alleged secret is with respect to the venting of the oven. Furthermore, it does not appear what plaintiff's alleged secret is with respect to the whole production line or any part of it. On cross-examination the following occurred: "Mr. Schoepe, tell me, if you can, what your trade secret is? A. That is my secret; I am not going to tell you."

No attempt has been made in this opinion to describe in detail the design and operation of the several coating processes referred to in the evidence as processes which were in existence prior to the installation of a coating process in plaintiff's plant. Such a description would extend this opinion unnecessarily. Sufficient references to other installations of coating processes have been made to show that there was sufficient evidence to support the finding to the effect that in

connection with the use of the Ransburg patented process there were in existence and use and in the public domain, prior to the making of the installation in plaintiff's plant, a closed spray booth, an oven, a conveyor with upright rotating spindles, and a vestibule; and that there was sufficient evidence to support the finding that plaintiff was not possessed of trade secrets. It was a question of fact for the determination of the trial court as to whether the installation at plaintiff's plant was unique, original or novel, as to whether the installation had been in the public domain, and as to whether it was a trade secret. The evidence was sufficient to support the findings of the trial court with respect thereto.

 Appellant also asserts that the evidence was insufficient to support the finding that there was no confidential relationship between plaintiff and Wilson. It argues that a confidential relationship existed between them by reason of the fact that Wilson was a consulting engineer. Whether such a relationship existed was a question of fact for the trial court to determine. The spray booth, oven, vestibule, and conveyor were made and installed by different companies, as above stated, and on occasions the representatives of those companies were present at the same time in plaintiff's plant while the various parts of the process were being installed. Also, many of plaintiff's employees were present while the installation was being made. The evidence was sufficient to support said finding.

By reason of the above conclusions, which require affirmance of the judgment, it is not necessary to discuss other contentions of appellant.

The judgment is affirmed, and the appeal from the order denying the motion for a new trial is dismissed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied December 15, 1949, and appellant's petition for a hearing by the Supreme Court was denied January 16, 1950.